UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SHAQUITA THOMPSON | * | CIVIL ACTION NO. 22-2149 |
| | * | |
| VERSUS | * | SECTION: "I"(1) |
| | * | |
| KILOLO KIJAKAZI, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION | * | JUDGE LANCE M. AFRICK |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************ | * | |

REPORT AND RECOMMENDATION

The plaintiff, Shaquita Thompson, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Act, 42 U.S.C. §§ 423, 1381. The matter has been fully briefed.[1] For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 14) be DENIED and that judgment be entered in favor of the defendant and against the plaintiff, dismissing plaintiff's complaint with prejudice.

**Procedural Background**

Ms. Thompson applied for SSI and DIB on August 13, 2020, asserting a disability onset date of June 16, 2020. She alleged the following illnesses, injuries, or conditions: sciatica, peripheral neuropathy, spinal cord degeneration, diabetes, high blood pressure, arthritis, and high cholesterol. On September 24, 2020, her claims were denied by the state agency. She applied for reconsideration, but her claims were again denied on February 25, 2021.

---

[1] Plaintiff has filed a Motion for Summary Judgment. (Rec. Doc. 14). In accordance with Rule 7 of the Supplemental Rules for Social Security effective December 1, 2022, the defendant has filed a brief. Pursuant to Supplemental Rule 5, the action is thereby presented for decision.

1

Ms. Thompson requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 26, 2021. On November 12, 2021, the ALJ issued an adverse decision. Ms. Thompson timely appealed to the Appeals Council, which denied review on June 17, 2022.

On July 13, 2022, Ms. Thompson filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 10, 11). The matter has been presented for decision via the Motion for Summary Judgment filed by Ms. Thompson and the brief filed by the Commissioner. (Rec. Docs. 14, 15). Ms. Thompson is represented by counsel.

## **Evidence in the Record**

*Hearing Testimony*

Ms. Thompson was 46 years old at the time of the hearing before the ALJ on October 26, 2021. R. at 81, 88. Ms. Thompson described her past work as a housekeeper at a hotel and later at Ochsner. R. at 90-91. In these positions she was lifting at most 20 pounds. Id. She stopped working on June 16, 2020, and has not worked since that time. R. at 91-92.

Ms. Thompson explained that she is limited from working because of sciatic nerve pain in her legs. R. at 92. She had been treating with pain pills and lidocaine patches. R. at 93. She testified that the patches help a little. Id. She also reported trouble with her feet and legs swelling due to her neuropathy. Id. She further testified that her feet are numb on the bottom. Id. Ms. Thompson reported that she had been using a cane for about six months. R. at 94.

The ALJ asked how much she thought she could lift without hurting herself. Id. She testified that she could probably lift 20 pounds but that she could not lift over 20 pounds. Id. Later, her attorney asked her to name something heavy she had lifted in the past month. R. at 97. She said nothing heavy, but when asked if she had lifted a gallon of milk, she responded, "I thought

you meant, like, something heavy." Id. Then she testified that she cannot carry more than a gallon of milk. Id. She confirmed that when she testified that she could not lift more than 20 pounds, she did not think that a gallon of milk weighed 20 pounds. Id. She explained that she does not really lift much because of her back and legs. Id.

Ms. Thompson testified that she can stand or walk for 15 minutes before needing a rest. R. at 94. She testified that she could sit in an office chair for 30 minutes. R. at 95. When she goes to a grocery store, she uses the electric cart to get around. R. at 98. Her daughter carries the groceries into the house. Id.

Ms. Thompson lives alone, but her daughter comes to help her with sweeping and vacuuming. R. at 95. Her daughter also prepares meals and cooks. Id. But Ms. Thompson does her own laundry and can prepare simple meals like a sandwich or microwaving food. Id. Ms. Thompson does not drive. Id. She repeatedly explained that she cannot work because of her legs. R. at 92, 98, 99.

Ms. Thompson also testified that she gets dizzy and drowsy from taking gabapentin. R. at 99. She has to lay down and nap for an hour and a half after taking it. Id.

Vocational expert Jennifer Smidt testified at the hearing. R. at 99. The ALJ asked her to consider a hypothetical individual with Ms. Thompson's age, education, and past work experience who is limited to sedentary work and further limited to lifting and carrying up to 10 pounds occasionally and less than 10 pounds frequently, who can stand and/or walk for two hours of an eight-hour workday, and who can sit for six hours in an eight-hour workday. R. at 101. Further, the person would require the use of an assistive device for ambulation, standing, and balance, but they would remain at the workstation on task and the opposite extremity could be used to lift and/or carry up to the exertional limitation. R. at 101-02. The person should never climb ladders, ropes,

and scaffolds; kneel; crouch; or crawl and can only occasionally climb ramps and stairs, stoop, and balance. R. at 102. The person can frequently reach overhead and in all other directions handle, finger, and feel bilaterally. Id. The person can occasionally use foot controls bilaterally. Id. Ms. Smidt testified that such a person could not perform Ms. Thompson's past work as a housekeeper. Id. However, she testified that this person could perform other work, for example, a call-out operator, Dictionary of Occupational Titles ("DOT") number 237.367-014, with an SVP 2, and with 3,000 jobs available nationally; document preparer, DOT 249.587-018, with an SVP 2, and with 16,800 jobs available nationally; and addresser, 209.587-010, with an SVP 2, and with 2,100 jobs available nationally. Id.

The ALJ asked Ms. Smidt to consider the same hypothetical individual but with the added limitation that because of the combined effects of the severe impairments, the individual would be absent from work two days a month. Id. Ms. Smidt testified that such a person could not perform Ms. Thompson's past work or any other work. Id.

In response to questioning by Ms. Thompson's attorney, Ms. Smidt testified that altering the hypothetical to require no climbing, balancing, stooping at all would not erode the number of jobs available or preclude the individual from performing the listed jobs. R. at 103. She also testified that if the person was off task for more than 15% of the day, that would eliminate sustaining competitive employment. R. at 103-04.

*Relevant Medical Records*

On September 1, 2019, Ms. Thompson presented at the emergency room with complaints of flank pain radiating down her left leg that had been present for the preceding four days. R. at 1034. She reported the pain started while she was at work. Id. She had been consuming a Goody's powder with no relief. Id. She endorsed chronic back pain and reported that her knees give out

sometimes. Id. However, on a review of symptoms, she was negative for back pain and weakness. Id. She was positive for left leg pain. R. at 1036. On physical examination, she had normal range of motion but exhibited tenderness in the left lumbar region extending to left buttock. Id. She had normal strength in the bilateral lower extremities. Id. Sensation was lightly decreased to light touch on the left leg compared to the right. Id.

Ms. Thompson treated with Dr. Jonathan H. Greenwald on October 4, 2019. R. at 1108. A neurovascular test was performed, and it was noted that sensation to light touch was abnormal to the left anterior leg in L5 distribution and soles of the feet. Id. However, her sensation to light touch was otherwise normal in all dermatomes and peripheral nerve distributions to bilateral lower extremities. Id. A motor exam showed weakness of the left ankle dorsiflexion and pain limited weakness of hip flexion. Id. Otherwise strength was full in the bilateral lower extremities. Id. Her gait was antalgic on the left. Id. Range of motion was slightly decreased. Id. She was negative for straight leg raise and Flexion, Adduction, Internal Rotation Test, but positive for Flexion, Adduction, External Rotation Test, iliac compression test over ilium, and piriformis strength test on the left. Id.

Ms. Thompson underwent a physical therapy evaluation on October 7, 2019. R. at 448. She presented with acute left-sided low back pain with left sided sciatica and bilateral leg weakness. Id. She reported pain in her left back, buttocks, and lower legs of 7/10, with her worst pain 10/10 and her best pain 6/10. R. at 450.

On October 8, 2019, an EMG with ultrasound and nerve conduction was performed. R. at 996. An impression of severe peripheral polyneuropathy affecting the bilateral lower extremities was noted. Id.

An MRI of the lumbar spine was performed on December 24, 2019. R. at 1052-53. An impression of lumbar spondylosis, contributing to mild spinal canal stenosis at L4-L5, and moderate neural foraminal narrowing at L4-L5 and L5-S1 was noted. R. at 1053.

During a February 5, 2020, appointment with Dr. Greenwald, it was noted that following the EMG/NCS, her symptoms persisted and an MRI was performed, showing multilevel degenerative changes with foraminal stenosis. R. at 426. Ms. Thompson reported attending a few sessions of physical therapy, but she stopped because it made her symptoms worse. Id. She was no longer taking medication for the pain, but reported that gabapentin was helping. Id.

On June 9, 2020, Ms. Thompson presented to the emergency room, complaining of left hip pain for six months. R. at 388. She denied numbness and tingling and reported that her left leg weakness was due to pain. R. at 389. But later during the same encounter, it was noted that she was positive for numbness and negative for weakness. R. at 390. She ambulated independently. R. at 389. She had full range of motion. Id. She reported taking gabapentin for pain, but that pain had not improved and had gotten worse that day. Id. Her left thigh was severely painful that day at 10/10 while at rest. Id.

On June 12, 2020, Ms. Thompson presented to FNP Michelle McCloskey, with chronic left sided low back pain. R. at 381. Ms. Thompson reported a recent three week episode of decreased pain but the pain had returned the previous week. Id. She was following up for increased left leg pain. Id. She reported the pain was affecting her sleep and daily activities. R. at 382. She was positive for numbness. R. at 383. Her gait was antalgic with a Trendelenburg sign present bilaterally. R. at 385. She had strength of 5/5 in her bilateral lower extremities. Id. She had full range of motion in her lumbar spine with pain on flexion more than extension. Id. She had a positive straight leg raise in an L5 distribution on the left. Id.

Ms. Thompson presented to Dr. Mary Yu with complaints of hip pain on July 6, 2020. R. at 375. A history of chronic lower back pain with chronic bilateral foot numbness was noted. Id. Ms. Thompson reported she could walk 30 minutes before having to sit down and could sit for about an hour before having to stand up. Id. On examination, no spinal tenderness to palpation was noted, but she had pain on palpation of the left sciatic notch and left thigh. R. at 376. She had a positive straight leg raise test on the left. Id. She had normal gait and 5/5 strength in her bilateral upper and lower extremities. Id.

On July 30, 2020, Ms. Thompson presented at the emergency room with spasms in her legs. R. at 366. She was positive for numbness and negative for weakness. R. at 367. She had normal strength and normal range of motion. R. at 368.

During an August 11, 2020, encounter with Lesleigh McGee, DPM, it was noted that Ms. Thompson was positive for paresthesias and sensory change. R. at 817. She was negative for loss of balance and numbness. Id. On physical examination, diminished gross sensation to the bilateral lower extremities was noted. Id. She had adequate joint range of motion to all lower extremity muscle groups with no pain or crepitation. Id. Her muscle strength was 5/5 in all groups bilaterally. Id. During the same encounter, Irielle Banks, APREN, FNP, noted no weakness. R. at 809. Ms. Thompson was noted to be positive for numbness. Id.

During an August 12, 2020, encounter with Nurse McCloskey, Ms. Thompson's gait was antalgic and a Trendelenburg sign was present bilaterally. R. at 1064. Decreased sensation to bilateral lower extremities was noted. Id. Ms. Thompson had full range of motion in her lumbar spine with pain on flexion and extension. Id. Her motor strength was 5/5 throughout her lower extremities. Id.

On September 24, 2020, Dr. Karl Boatman, state agency reviewing examiner, considered Ms. Thompson's medical records and determined Ms. Thompson is limited to sedentary work. R. at 116. He found she was limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing or walking 2 hours in an eight-hour workday; sitting about 6 hours in an eight-hour workday; and occasional climbing, balancing, stooping, kneeling, crouching, and crawling. R. at 113-14.

Ms. Thompson followed up with Dr. Yu on October 6, 2020. R. at 662. She reported that she has chronic low back pain that previously radiated to the left leg but is now affecting the right leg also. Id.  She reported severe nighttime pain on the left knee and hip that prevents her from lying on her side. Id.  She also reported she could only walk about 30 minutes and that her pain is worse with walking. Id.  She further reported she could stand for about 15 minutes before needing to sit down. Id.  She was walking with a cane. Id.  Her gait was antalgic. R. at 663. Her legs were painful on minimal palpation bilaterally. Id.

During an October 20, 2020, encounter with Nurse McCloskey, Ms. Thompson had 5/5 motor strength throughout the lower extremities. R. at 1052. She reported numbness, and decreased sensation to bilateral lower extremities was noted. R. at 1048, 1052. She had full range of motion in her lumbar spine with pain on flexion and extension. R. at 1052. She had a positive straight leg raise bilaterally at an S1 distribution. Id.

Consulting examiner Dr. Michael Day conducted a physical examination of Ms. Thompson on February 12, 2021. R. at 686. She used a single point cane in her right hand as an assistive device. Id.  Dr. Day had a note from her primary care physician dated October 20, 2020, regarding her chronic low back pain, diabetes, and diabetic retinopathy. Id.  Dr. Day also reviewed an

October 2019 EMG student and an MRI of the lumbar spine from October 2020.[2] Id. Ms. Thompson reported peripheral neuropathy in her feet bilaterally with tingling, burning, stinging pain and lack of balance. R. at 687. She reported being able to feed, bathe, dress, toilet, and transfer with assistance of her cane. Id. She reported needing assistance with housework, yardwork, cooking, shopping, and meal preparation due to peripheral neuropathy and lower back pain. Id.

Dr. Day observed that Ms. Thompson appeared to be in some pain when ambulating down the hallway even when using her cane. Id. She was able to get on and off the exam table and in and out of the chair without assistance. Id. She was not able to tandem walk, stand on her heels or toes, hop, bend, or squat due to lower back pain and the need for an assistive device as well as peripheral neuropathy. Id. Without her cane, Ms. Thompson was only able to take a few steps from the door to the exam table. Id. Even with the cane, she had a significant limp and her gait was broad based. Id. She had negative straight leg test on the left both seated and supine. R. at 689. On the right she was positive 0-60, seated and supine. Id. Her strength was 5/5 in the upper extremities and 4/5 in the lower extremities. Id. She had normal range of motion in the neck, shoulders, elbows, wrists, and thumb/fingers. Id. She had normal flexion, extension, abduction, and adduction in her hips, and normal flexion and extension in her knees. Id. Range of motion in her ankles was normal. Id. She had decreased flexion of 0-30 degrees in her back. Id. Dr. Day found Ms. Thompson had sensory deficits to light touch and vibratory sense on the bottom of her feat bilaterally from peripheral neuropathy and the L5-S1 distribution on the lower right extremity, consistent with sciatic nerve involvement. Id. She had a positive Romberg test. Id.

Dr. Day provided the following functional assessment: Ms. Thompson can stand less than two hours due to the right lower back sciatic symptoms and peripheral neuropathy; a single point

---

[2] This may be an error because the only MRI in the record seems to be the one from December 2019.

cane is needed at all times and on all terrain; she can lift less than ten pounds occasionally and frequently due to cane dependence and peripheral neuropathy; she should not be climbing, balancing, stooping, kneeling, crouching, or crawling due to her lower back limitations and peripheral neuropathy; she can reach, handle, finger, and feel on a frequent basis especially from a seated position; and she should not be working at heights due to peripheral neuropathy. R. at 690.

On reconsideration, state agency reviewing physician Dr. Charles Gruenwald considered Ms. Thompson's medical records, including the examination of Dr. Day. R. at 112-13. In assessing Dr. Day's opinion, Dr. Gruenwald found the physical findings were exaggerated in severity of ambulatory and postural impairments as compared to findings noted in the most recent medical records and the findings in the lumbar spine imaging. R. at 132. He suggested this could be due to a chronic low back pain flare at the time that would not represent baseline. Id. He was therefore reluctant to erode the initial assessment of Ms. Thompson's functional capacity by Dr. Boatman. Id.  Dr. Gruenwald found Ms. Thompson was limited to occasional lifting of 20 pounds and frequently lifting 10 pounds; standing or walking for 2 hours; sitting for about 6 hours; and occasional climbing, balancing, stooping, kneeling, crouching, and crawling. R. at 130-31. He found she should also avoid concentrated exposure to vibration or hazards. Id.

Ms. Thompson presented at the emergency room on July 19, 2021, with lower abdominal pain, sciatic nerve pain radiating to legs, and fatigue. R. at 1117. She ambulated with a walker due to her sciatic pain. Id.  On a review of systems, she was positive for weakness globally. R. at 1118. She had normal range of motion of the cervical back. Id. The next day before her discharge, she was positive for back pain, although a report of 0/10 on the pain scale was noted. R. at 1128. She

was grossly intact neurologically with no focal numbness or weakness and with normal strength and tone. R. at 1129.

On July 29, 2021, Ms. Thompson presented to Dr. Koyenum Obi. R. at 1194. The presence of a sensory deficit in the bilateral extremities was noted. Id. Ms. Thompson had normal range of motion. Id. Progress notes state that Ms. Thompson's sciatica was intermittent in nature and seemed to be back. R. at 1195. It was noted that she was on over the counter Tylenol and gabapentin. Id. She was encouraged to try sciatica stretches and exercises. Id.

Ms. Thompson followed up with Nurse Banks on October 5, 2021, for diabetes. R. at 1172. She was positive for numbness and tingling on a review of systems. R. at 1173. On physical examination, she had a steady gait. R. at 1175.

## Decision of the Administrative Law Judge

The ALJ found Ms. Thompson suffered from the following severe impairments: degenerative disc disease of the lumbar spine with sciatica, type II diabetes mellitus, and neuropathy. However, the ALJ found Ms. Thompson does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ next found that Ms. Thompson has the residual functional capacity to perform a range of sedentary work: she can lift and carry up to ten pounds occasionally and lift or carry less than ten pounds frequently; she can stand and/or walk for two hours out of an eight-hour workday, and she can sit for six hours of an eight-hour workday. She would require the use of an assistive device for ambulation, standing, and balance, but she would remain at the workstation on task and the opposite upper extremity could be used to lift and/or carry up to the exertional limitation. She could never climb ladders, ropes, and scaffolds; kneel; crouch; or crawl. She can occasionally

climb ramps and stairs, stoop, and balance, as defined by the SCO. She can frequently reach overhead and in all other directions handle, finger, and feel bilaterally. She can occasionally use foot controls bilaterally. She should never work at unprotected heights or with moving mechanical parts. She can occasionally work in vibration.

In determining Ms. Thompson's residual functional capacity, the ALJ considered the medical evidence of record, including the opinions of state agency medical consultants Dr. Boatman and Dr. Gruenwald, and the consultative examiner Dr. Day. Of relevance to the present appeal, the ALJ found Dr. Day's opinion only partially persuasive. Although the ALJ found the opinion was supported by his detailed report documenting his findings and observations from his consultative examination, the ALJ found that some of Dr. Day's opinions were not entirely consistent with his own findings or with other substantial evidence of record. The ALJ explained that although clinical findings and other records support Ms. Thompson's need for a cane for ambulation, balance, and standing, the other evidence, including the opinions of Dr. Boatman and Dr. Gruenwald, is not consistent with Dr. Day's opinion that Ms. Thompson cannot stand and/or walk for up to two hours in an eight-hour workday. Further, the ALJ explained that Dr. Day's opinion that Ms. Thompson cannot lift 10 pounds occasionally is inconsistent with multiple examinations showing 5/5 motor strength in the bilateral upper extremities. The ALJ explained further that other examinations showing full, albeit painful, range of motion in the spine fail to support that Ms. Thompson could never climb ramps and stairs, stoop, or balance.

The ALJ next found that Ms. Thompson cannot perform any of her past relevant work. The ALJ found that Ms. Thompson was 45 years old, which is defined as a younger individual, on the alleged disability onset date. The ALJ found that Ms. Thompson has a limited education. Then, relying on the expert testimony, the ALJ found that considering Ms. Thompson's age, education,

work experience, and residual functional capacity, there are jobs that exist in significant numbers that Ms. Thompson can perform.

## Statement of Issues on Appeal

Issue No. 1.  Did the ALJ fail to properly evaluate and explain the persuasiveness of Dr. Michael Day's medical opinion?

## Analysis

### I. Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)). This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.     **Entitlement to Benefits under the Act.**

To be considered disabled under the Act, a claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id. An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

### III.    Plaintiff's Appeal.

*Issue No. 1.    Did the ALJ fail to properly evaluate and explain the persuasiveness of Dr. Michael Day's medical opinion?*

Ms. Thompson argues that the ALJ's analysis of Dr. Day's opinion failed to properly follow the regulatory requirements. She submits that the most important factors the Commissioner must consider in evaluating a medical source opinion is the supportability and consistency with the medical evidence. She points out that the ALJ found Dr. Day's opinion is supported by detailed findings and is consistent with other physical examinations throughout the record. She argues that the ALJ failed to articulate a rational explanation of the supportability and consistency of Dr. Day's opinion. She admits that the ALJ found that Dr. Day's opinion that Ms. Thompson is restricted to less than 2 hours of walking or standing was only partially persuasive because it was inconsistent with the opinion of Dr. Boatman and Dr. Gruenwald. But she submits that Dr. Boatman and Dr. Gruenwald were non-examining physicians. She argues that the ALJ's finding is conclusory because it could also be said that Dr. Boatman and Dr. Gruenwald's opinions are inconsistent with that of Dr. Day. She insists the ALJ was required to consider the consistency of Dr. Day's opinion with other evidence. She argues that less than 2 hours is not substantially different from 2 hours. She argues further that the ALJ failed to consider supportability. She insists that the opinion is supported by her treatment records, such as the October 2019 EMG that revealed a severe peripheral neuropathy affecting her bilateral lower extremities. She says this record also documents sensory loss in both feet as well as an L5-S1 distribution. She submits these findings are identical to those of Dr. Day. She also points to the records documenting an antalgic Trendelenburg gait as consistent with Dr. Day's opinion.

Ms. Thompson argues that the ALJ erred in concluding that Dr. Day's opinion restricting her to lifting/carrying ten pounds less than occasionally was inconsistent with repeated

15

examinations showing 5/5 motor strength in both upper extremities. She argues her upper extremity strength is irrelevant because she alleges disability due to deficits involving her lumbar spine. She argues that her treatment records show reflex and sensory loss in her lower extremities, a positive straight leg raise test and gait abnormalities. She insists that this lumbar pathology resulted in chronic and severe pain exacerbated by lifting. She submits that Dr. Day's opinion supports a finding that the pain and deficits involving lower extremities can significantly limit an individual's ability to lift and carry.

Ms. Thompson argues that this matter must be remanded because the ALJ failed to comply with the requirements of §404.1520c by failing to consider the supportability of Dr. Day's opinion and making only conclusory findings with regard to consistency.

The Commissioner argues that the ALJ gave good reason for finding Dr. Day's opinion only partially persuasive. She submits that the ALJ found Dr. Day's opinions that Ms. Thompson was able to stand and walk less than two hours and was able to lift and carry less than ten pounds occasionally was not persuasive because they were inconsistent with Dr. Day's own notes showing Ms. Thompson had 5/5 upper extremity strength. Further, she submits that the ALJ found Dr. Day's opinions inconsistent with other examination notes showing she had normal motor strength, had normal range of motion, and was neurologically intact. The Commissioner insists that the ALJ complied with the regulations and that substantial evidence supports the ALJ's findings. She argues that this Court must not reweigh the evidence and try the questions *de novo* or substitute its opinion for that of the Commissioner.

As the parties agree, when considering medical opinions and prior administrative medical findings, the ALJ does not defer or give any specific evidentiary weight to any opinion or finding. 20 C.F.R. § 404.1520c(a). Instead, in evaluating the persuasiveness of a medical opinion, the ALJ

will consider supportability, consistency, relationship to the claimant, length of the treatment relationship, and frequency of examinations, with supportability and consistency being the most important. Id. § 404.1520c(a)-(c).

In this case, the ALJ was faced with conflicting medical opinions. In September 2020, Dr. Boatman reviewed Ms. Thompson's medical records and determined that she was limited to walking and standing two hours in an eight hour workday, that she could lift and carry 20 pounds occasionally and 10 pounds frequently, and that she could occasionally climb, balance, stoop, and kneel. In February 2021, Dr. Day examined Ms. Thompson and concluded that she was limited to walking and standing less than two hours in an eight-hour workday, lifting and carrying less than 10 pounds occasionally and frequently, and that she could never climb, balance, stoop, or kneel. Later in February 2021, Dr. Gruenwald reviewed Ms. Thompson's medical records including Dr. Day's opinion and found that Ms. Thompson was limited to walking and standing two hours in an eight-hour workday, that she could lift and carry 20 pounds occasionally and 10 pounds frequently, and that she could occasionally climb, balance, stoop, and kneel.

In finding Dr. Day's opinion only partially persuasive,[3] the ALJ considered consistency and supportability by finding that Dr. Day's opinions were not entirely consistent with his own findings or other substantial evidence of record. The ALJ pointed out the opinions of both Dr. Boatman and Dr. Gruenwald were inconsistent with Dr. Day's with regard to the standing/walking limitation. The ALJ also determined that Dr. Day's lifting restriction was inconsistent with his own examination findings as well as other findings in the medical evidence that Ms. Thompson had 5/5 strength in her bilateral upper extremities. The ALJ further found that Dr. Day's finding

---

[3] As the Commissioner points out, the ALJ adopted Dr. Day's findings that Ms. Thompson was limited to sedentary work with the use of an assistive device to walk, stand, and balance, and that she should not work at unprotected heights.

that Ms. Thompson could never climb ramps and stairs, stoop, or balance, was not consistent with other examinations showing full, albeit painful range of motion of the spine. In so doing, the ALJ followed the regulatory requirements.

    Ms. Thompson cannot dispute that the ALJ made these findings. Instead, she argues these findings are not enough. Essentially she disagrees with the ALJ's balancing of the evidence. She does not dispute that the medical evidence shows that she has 5/5 strength in the upper extremities. Instead, she argues that this is not factually inconsistent with the lifting restriction imposed by Dr. Day. She argues that her back pain prevents her from lifting. But none of her treatment records contain any complaints related to lifting that would support this conclusion. While Dr. Day found that she was limited to lifting less than ten pounds due to cane dependence and peripheral neuropathy, Dr. Gruenwald considered this evidence and found she was capable of lifting 20 pounds occasionally and 10 pounds frequently. That the ALJ chose one interpretation over the other when there are no other treatment records to support Dr. Day's opinion is not error. And in any event, the ALJ considered all the evidence of record in determining the lifting restrictions. For example, it is undisputed that the ALJ considered medical records consistently showing Ms. Thompson had 5/5 strength in the upper extremities. Additionally, the ALJ noted that the examinations in the record "do not document any significant motor or neurological deficits in the upper extremities." R. at 17. The Court agrees, and Ms. Thompson has cited no evidence to the contrary. The ALJ found that "while claimant may indeed have some back and leg [sic] due to degenerative disc disease, poorly controlled diabetes, and neuropathy, the evidence shows that she is able to ambulate effectively with the use of a single point cane and she does not have any significant deficits in her upper extremities." R. at 18. The ALJ concluded that Ms. Thompson would be able to perform sedentary work with the use of a single point cane "while being able to

use the opposite upper extremity to lift and carry up to 10 pounds occasionally and less than 10 pounds frequently." Id. The ALJ thus considered the effect of cane dependence identified by Dr. Day as impacting Ms. Thompson's lifting ability. Because the use of a cane while walking and standing was part of the hypothetical presented to the vocational expert, her opinions regarding available jobs also took into account the impact of cane dependence.

Similarly, Ms. Thompson does not dispute that Dr. Boatman and Dr. Gruenwald limited her to two hours of walking or standing. Instead, she argues that their two opinions do not trump Dr. Day's "less than two hours" finding. While it might have been acceptable for the ALJ to adopt Dr. Day's finding in lieu of that of Dr. Boatman and Dr. Gruenwald, the ALJ was not required to do so. Dr. Gruenwald explicitly considered Dr. Day's opinion and found the symptoms observed by Dr. Day were exaggerated in light of her MRI and October 2020 medical records. He opined that the symptoms observed by Dr. Day might reflect a flare in Ms. Thompson's lower back pain. The ALJ reviewed the opinions and the medical evidence. For example, the ALJ cited medical records in October 2021 and July 2020 noting a normal or steady gait and numerous records showing 5/5 motor strength in the lower extremities.

The Court finds that the ALJ complied with the regulations in considering the supportability and consistency of Dr. Day's opinion in finding that opinion less than persuasive. Further, the Court finds that the ALJ's conclusions are supported by substantial evidence. It is not this court's role to reweigh the evidence. Perez, 415 F.3d at 461.If more than a scintilla supports the ALJ's conclusion, the Court must affirm. See Richardson, 402 U.S. at 401.

**RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 14) be DENIED and that judgment be entered in favor of the defendant and against the plaintiff, dismissing plaintiff's complaint with prejudice.

**OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 21st day of July, 2023.

_____
Janis van Meerveld
United States Magistrate Judge